UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
JUAN MIGHTY,

                                    Petitioner,

                                                          **MEMORANDUM AND ORDER**

         - against -                                      16-CV-5063 (RRM) (LB)

SUPERINTENDENT S. CRONIN,

                                    Respondent.
----------------------------------------------------------------------x
ROSLYNN R. MAUSKOPF, United States District Judge.

       Petitioner Juan Mighty petitions this Court for a writ of habeas corpus pursuant to 28

U.S.C. § 2254, challenging his June 28, 2010, conviction in the Supreme Court of the State of

New York, Queens County, for attempted assault in the first degree, two counts of assault in the

second degree, and various misdemeanors.  For the reasons set forth below, the petition is

denied, and this case is dismissed.

                                    **BACKGROUND**

       The charges in this case arise from an incident which took place on July 26, 2009, at the

Jamaica, Queens, home of Melvenia Hearns, a woman with whom petitioner had had a decades-

long, on-and-off relationship that produced two children.  Around 8:00 that evening, after a day

of heavy drinking in which the couple quarreled about Hearns' alleged infidelity and other

things, petitioner burst into Hearns' bedroom with two knives: a large butcher knife and a

smaller steak knife.  After stating that he was not going to use the butcher knife because it would

kill her faster and that he wanted to torture her, petitioner repeatedly stabbed Hearns with the

steak knife and beat her with his fists and the handle of the knife.  He also pressed his elbow into

her neck and burned her repeatedly with an unknown object.

The assault continued for approximately 1½–2 hours, ending only after one of the couple's children – Juan Mighty, Jr. ("Juan") – returned home to hear his mother screaming. After Juan banged on the bedroom door, petitioner briefly grabbed him by the neck before leaving the bedroom and going downstairs.  Hearns was ultimately able to escape and, with the help of a Good Samaritan, contact the police.   Petitioner was arrested a few hours later when Police Officer Daniel Ward saw someone fitting petitioner's description hiding in a telephone booth.

Petitioner was subsequently indicted on various charges, most of which related to the events of July 26.   Count One of the indictment charged petitioner with attempted assault in the first degree on the theory that he had attempted to cause serious physical injury to Hearns by means of a deadly weapon or a dangerous instrument – to wit, a knife.  The next two counts charged petitioner with two counts of assault in the second degree on the theory that he intentionally caused physical injury to Hearns by means of a deadly weapon or a dangerous instrument – a knife and the object that burned her.   Three other counts charged assault in the third degree on the theory that petitioner caused physical injury to another by 1) punching Hearns' face, head, and arms; 2) pushing his elbow into Hearns' neck; and 3) grabbing Juan by the throat.  The indictment also charged petitioner with two counts of criminal possession of a weapon in the fourth degree on the theory that petitioner possessed a knife and a deadly weapon or dangerous instrument that caused Hearns' burns.

Finally, the indictment charged an offense that occurred after the July 26 incident.  It charged petitioner with committing witness tampering in the third degree by sending a letter to Hearns on August 21, 2009, which implied that he might harm her if she testified against him.

2

Prior to trial, petitioner was offered a plea bargain.  Under the proposed deal, he would plead guilty to a single count of assault in the second degree and receive a determinate sentence of 4 years' imprisonment and 5 years of post-release supervision.  (6/22/2010 Transcript at 4 (Doc. No. 8-1 at 4).)  Although petitioner was informed that he could be sentenced to 15 years' imprisonment if convicted on the top count of the indictment, (*id.* at 3), he rejected the plea bargain and went to trial before Acting Justice Barry Kron in late June 2010.  (*Id.* at 14.)

<u>The Trial</u>

The People presented four witnesses: Hearns, Juan, Officer Ward, and Netta Bedasse, an Emergency Medical Technician who had treated Hearns shortly after the incident.  Hearns, who was 41 years old at the time of trial, testified that she had first met petitioner when they were both students at John Adams High School.  (T. 91, 93, 123.)[1]  After high school, they entered into a relationship that ultimately produced two children: Juan and a daughter, Janay.  (T. 92–93, 124.)  They lived together for a year or two when they were in their early twenties but separated before Janay, who was 17 at the time of trial, was born.  (T. 124–26.)  Thereafter, they saw each other periodically; petitioner sometimes visited Juan and occasionally paid child support.  (T. 126.)

Sometime in 2008, they rekindled their relationship and petitioner moved into the duplex at 123-65 147th Street where Hearns was living with Juan and Janay.  (T. 132.)  In February 2009, however, petitioner accused Hearns of not only seeing another man but of giving him money.  (T. 133–34.)  When Hearns denied it, he accused her of lying.  (T. 134.)  They argued about her infidelity frequently thereafter and, as their relationship deteriorated, petitioner began

---

[1] Numbers preceded by "T" denote pages in the Trial Transcript contained in Doc. No. 8-1.

to spend more time out of the house, drinking.  (T. 133–35.)  On July 21, 2009, Hearns stayed

out overnight, heightening petitioner's suspicions and prompting another argument.  (T. 136.)

Five days later, on July 26, 2009, at about 8:00 p.m., petitioner burst into Hearns'

bedroom wielding a butcher knife and a steak knife.  (T. 94–95.)  He asked Hearns, who was

sitting on her bed, which one she wanted.  (T. 95.)  When Hearns asked what he was talking

about, he stated that he would not use the butcher knife because it would kill her faster but would

instead use the steak knife because he wanted to torture her.  (T. 95.)

After laying the butcher knife on the bed, petitioner angrily questioned Hearns about her

alleged infidelity, accusing her of lying about it and demanding to know if she was cheating on

him.  (T. 97.)  When she denied cheating, he punched her in the temple and jabbed the knife far

enough into her legs and arm to cause bleeding.  (T. 97–98.)  Although Hearns attempted to

defend herself using her hands, she was nonetheless stabbed repeatedly.  (T. 153–54.)

Eventually, petitioner said he would give her "a pass" and would leave if she would

confess her infidelity.  (T. 99.)  Hearns believed him and told him "what he wanted to hear,"

even making up a name for her non-existent paramour.  (T. 99.)  However, petitioner did not

leave; instead, he started hitting her in the head, making her dizzy.  (T. 99.)  At some point, he

struck her twice on the head with the knife handle, opening a cut that would take nine staples to

close. (T. 101, 106.)

When Hearns lay back on the bed, petitioner pressed his elbow into her neck.  (T. 99.)

As he did so, he told Hearns, who sang in church and elsewhere, "When I am done with you[,]

you won't be able to sing[.]"  (T. 99.)  Although Hearns "felt like [her] neck was caving," (T.

99), neither she nor anyone else testified about the injuries sustained to her neck.

4

Thereafter, petitioner began burning Hearns on the arms.  (T. 100.)  She did not take note the object used to burn her, testifying only that "[i]t was something clear."  (T. 100.)  However, the burns hurt enough to cause her to scream.  (T. 100.)

Juan testified that he returned home around 9:30–10:00 p.m. to hear his mother screaming in her bedroom.  (T. 44.)  He immediately went upstairs and banged on the bedroom door.  (T. 46.)  When petitioner opened the door, Juan saw blood on the chest of his white undershirt and a bloody steak knife in his hand.  (T. 46–47, 61.)  According to Hearns, petitioner greeted Juan, stepped out of the room, and closed the door behind him.  (T. 101.)

Juan recalled that when he asked what was going on, petitioner yelled that Hearns was cheating on him and that Juan knew about it.  (T. 47–48.)  Petitioner then grabbed Juan around the Adam's apple, squeezing it tightly with his thumb and first two fingers.  (T. 48.)  That not only hurt "real bad" but caused Juan to lose his breath.  (T. 48.)  Juan was nonetheless able to pull his father's hand off his neck and to push it away.  (T. 48.)

Hearns corroborated Juan's account of his conversation with petitioner and testified that she opened the bedroom door in time to see Juan push petitioner's hand off his neck.  (T. 101–02.)  According to Hearns, petitioner continued to yell at Juan, threatening to kill him, Hearns, and Hearns' father, who lived in an apartment below Hearns'.  (T. 102.)  Both Hearns and Juan recalled that petitioner then ran downstairs, followed by Juan and Hearns.  (T. 48, 50, 102.)

Juan saw Hearns when she emerged from the bedroom.  He recalled that Hearns had blood all over her hair, face, shirt, and the left side of her body; that her face was puffy and swollen; and that she looked tired, "like she was struggling."  (T. 49, 62.)  Both Juan and Hearns testified that Juan pushed his mother into a bathroom at the foot of the stairs.  (T. 50, 102.)  However, they disagree as to whether the bathroom door remained open.  Juan testified that it

5

did, (T. 50), while Hearns recalled closing the door and pressing a towel to her head, which was bleeding heavily and throbbing.  (T. 103.)

Petitioner, who had been in the downstairs living room at the time Hearns entered the bathroom, then grabbed Juan by the collar and pulled him into the kitchen.  (T. 50.)  Because the kitchen had a "half wall," Hearns and Juan were able to see one another when she peeked out of the bathroom a few minutes later.  (T. 51, 103–04.)  Both Juan and Hearns testified that Juan gestured for her to leave.  (T. 51, 104.)  Juan testified that he then held his father in a bear hug to allow his mother time to escape, during which time he smelled "[j]ust a little" alcohol on petitioner's breath.  (T. 52, 55, 59.)

When Hearns ran out of the duplex, petitioner ran towards the front door and looked out. (T. 52.)  Anxious to escape himself, Juan climbed over the railing of the living room balcony. (T. 52–53.)  Although the balcony was on the third floor, Juan planned on jumping.  (T. 52. 63.) However, while Juan was still clinging to the railing, petitioner told him not to jump and pulled his six-foot, 140-pound son to safety.  (T. 53.)  Petitioner then ran upstairs to the bedroom while Juan waited in the living room.  (T. 53.)  Petitioner and Juan then walked ten minutes to petitioner's sister house.  (T. 54, 63.)

Meanwhile, Hearns found refuge in the apartment of a stranger who lived on the other side of her apartment complex.  (T. 104.)   Hearns saw a woman coming from the garbage chute and asked for help, saying, "He is trying to kill me."  (T. 104.)  The woman ushered Hearns into her bathroom, provided a towel that Hearns could press to her still-bleeding head, and called the police.  (T. 105–06.)

Netta Bedasse, an Emergency Medical Technician ("EMT") employed by the New York City Fire Department, testified that she received a call at around 9:45 p.m. to respond to a

6

second-floor apartment at 125-06 Sutphin Avenue.  (T. 20–21.)  There, she found Hearns in the bathroom, crying hysterically and sweating.  (T. 23.)  Although Bedasse and her partner were in uniform, Hearns cowered and "started to cover herself like she was scared" of them.  (T. 23–24.)

The EMTs "examined her from head to toe."  (T. 24.)  They found that she had lacerations to her head, fingers, forearms, and thighs.  (T. 24.)  Her face and lips were swollen and she had abrasions under both eyes.  (T. 24.)  In addition, she had burns on her forearms.  (T. 25.)  The EMTs stopped the bleeding from her head, arms, and legs; bandaged the lacerations; and transported her to Jamaica Hospital.  (T. 25, 30.)

Bedasse subsequently completed paperwork relating to Hearns' condition.  This paperwork, which was introduced in evidence, indicated that Hearns had suffered multiple stab wounds to her upper leg and upper and lower arm.  (T. 27.)  Bedasse testified that those wounds were not deep, but that Hearns had described her pain level as 10 on a scale of 1 to 10.  (T. 36, 40.)

According to Hearns, she received nine staples in her head and stitches in her arm and leg.  (T. 106.)  After she was released from the Emergency Room in the early morning of July 27, 2009, her legs hurt so badly that she felt the need of a cane for four weeks.  (T. 109.)  Hearns claimed her arms remained sore for two months and her head still hurt at the time of trial, nearly 11 months after the incident.  (T. 109.)

Petitioner was apprehended by Officer Ward around 1:00 a.m. on July 27, 2009.  (T. 76.)  That night, Ward was assigned to a foot post on Sutphin Boulevard, Jamaica, near Hearns' home.  (T. 75.)  Around 11:00 p.m. on July 26, 2009, a sergeant stopped by Ward's post to inform the officer of the incident.  (T. 76, 87.)  The sergeant named petitioner as a suspect, gave Ward a description, and showed him a photograph of petitioner.  (T. 76, 87.)

7

About two hours later, Ward spotted someone matching the description poking his head in and out of a phone booth located at 119th Avenue and Sutphin Boulevard, a few blocks north of Hearns' home.  (T. 76, 85.)  Ward approached the man and asked him for identification.  (T. 76.)  After the man produced a driver's license that confirmed that he was petitioner, Ward arrested him and took him to the 113th Precinct.  (T. 76–77.)  At trial, Ward identified petitioner as the man he arrested.  (T. 77.)  Ward testified that petitioner did not have blood on his clothes and did not smell of alcohol, but could not recall if he seemed drunk.  (T. 77, 86.)

After transporting petitioner to the precinct, Ward was directed to go to Hearns' apartment to recover the knife used in the incident.  (T. 77–78, 88.)  Around 1:30 a.m., he entered Hearns' bedroom to find "everything was a mess"; sheets were all over the bedroom and there was blood on the sheets, the walls, and the floor.  (T. 78.)  The butcher knife was still laying on the bed.  (T. 78, 80, 89–90.)  Ward took that knife back to the precinct, where he vouchered it.  (T. 78.)  Ward did not see any other knives and only the butcher knife was introduced at trial.  (T. 89.)

At around 2:00 a.m. on July 27, 2009, Ward went to Jamaica Hospital to interview Hearns.  (T. 82–83.)  Although bandages had already been applied to the major injuries, Ward could nonetheless see burns on both arms and small cuts and abrasions covering her "entire body," including her legs.  (T. 83, 90.)  According to Ward, she "seemed to be in pain."  (T. 83.)

The prosecution introduced two other noteworthy pieces of evidence.  First, the prosecution introduced a tape recording of a telephone conversation petitioner had with his brother on July 29, 2009, while petitioner was incarcerated at Rikers Island.  In that conversation, petitioner admitted stabbing Hearns, saying he stabbed her only "a little bit[.]"  (T. 200–01.)  The parties stipulated that the tape was a "business record of the New York City

8

Department of Corrections." (T. 156.)  Second, the parties stipulated that petitioner had written Hearns and Juan a series of letters in which he apologized and asked them not to testify against him. (T. 156.)  In those letters, petitioner stated that the incident would not have happened had he not been drinking and claimed to have no memory of the incident, but also stated that he used a small knife with a corkscrew and not the butcher knife. (T. 156.)

The Defense Case

Petitioner testified on his own behalf and was the only witness for the defense.  His testimony about his relationship with Hearns largely corroborated Hearns' testimony. Specifically, he testified that they had met in high school, had started a relationship in January 1990, had lived together for 1½–2 years when they were in their early twenties, and had two children. (T. 165–68.)  After a lengthy hiatus, they reunited, and he moved into her duplex in 2008. (T. 172.)  In February 2009, however, they began to argue about various things, including whether she was having an affair. (T. 172–74.)

Like Hearns, petitioner recalled that the deterioration of their relationship was exacerbated by an incident that occurred on July 21, 2009.  According to petitioner, Hearns went out during a rainstorm but returned dry, though she claimed to have been out looking for her sister's house. (T. 176.)  Both petitioner and his sister, who was visiting at the time, deduced that she was lying. (T. 176.)  Petitioner took this as evidence of her infidelity. (T. 176.)

According to petitioner, he and Hearns had a history of drinking and using drugs together and they were drinking heavily and smoking marijuana in 2008, when he moved in with her. (T. 174.)  On the night of July 25–26, 2009, the two drank, smoked, and argued the entire night. (T. 176–79.)  Petitioner recalled that they began by consuming at least a fifth of vodka, two quarts of beer, and a quarter-ounce of marijuana, then went out to the store a couple of times. (T. 177.)

9

By the afternoon of July 26, when petitioner left the duplex to walk his sister to the bus stop and to buy another fifth of vodka, petitioner was intoxicated.  (T. 179, 191.)  After putting his sister on the bus and buying the vodka, he saw a sign advertising relationship therapy.  (T. 179.)  He briefly met with a Dr. June, who refused to help him because he was drunk.  (T. 180.)

Petitioner did not recall exactly when he returned to the duplex but remembered that it was "still early" and that Hearns was making a turkey bologna sandwich when he entered.  (T. 180, 205.)  They smoked marijuana and drank and argued some more before Hearns went upstairs to the bedroom, leaving him alone downstairs.  (T. 180.)  Petitioner specifically recalled "listening to sad songs," but claimed that he was "so drunk and high" that everything became "hazy" thereafter.  (T. 180.)

Petitioner denied remembering anything about the incident, though he thought he "hurt" Hearns and Juan.  (T. 182.)  Petitioner then broke down on the stand, stating that he never intended to hurt them and that his excessive alcohol consumption was to blame.  (T. 182–83.)  However, he remembered many details regarding his arrest, including what the officers said to him.  (T. 180–81.)

On cross-examination, the prosecutor questioned petitioner about the telephone call with his brother in which he admitted stabbing Hearns "a little" and the letters he had written to Hearns in which he apologized for his behavior.  Although this evidence suggested that petitioner had a better recollection of the incident than he claimed, petitioner claimed that he had learned about the incident from others.  (T. 200–01, 206.)  He admitted that he wrote the August 21, 2009, letter and that he did so because he did not want Hearns to testify against him.  (T. 210.)

The Summations, Charge, and Verdict

In keeping with petitioner's testimony, defense counsel's summation focused on intent. First, defense counsel argued that petitioner was too intoxicated on July 26, 2009, to form the intent necessary to commit the crimes he was charged with committing that night.  (T. 221.) Second, counsel noted that the injuries to Hearns were not "life threatening" and did not evince an intent to cause serious physical injury – an element of attempted assault in the first degree. (T. 222–24.)  In the course of reviewing the medical records which had been introduced in evidence, defense counsel noted that Hearns did not complain of throat injuries and argued that this was evidence that no such injuries had been sustained.  (T. 225.)

Defense counsel also argued that Hearns' trial testimony concerning the two knives was inconsistent with prior statements she had made to the police and the grand jury.  First, he noted that in her first statement to the police she mentioned only a single knife and stated that she had only been stabbed a couple of times.  (T. 227.)  Defense counsel further noted that Hearns had not mentioned that petitioner had two knives when she testified before the grand jury.  (T. 227.)

In her summation, the prosecutor urged the jury not to "confuse" petitioner's inability to recall the events with his inability to form the intent needed to commit the offenses charged.  (T. 233.)  However, the prosecutor also cast doubt on petitioner's claim that he was unable to remember the incident, noting that he recalled events that occurred that night and was capable of lifting his 140-pound son over the balcony railing.  (T. 233–35.)  The prosecutor specifically rebutted defense counsel's intent argument, arguing that petitioner was jealous and intended to "so seriously injur[e Hearns] that she would have the scars a year later."  (T. 238.)

Justice Kron charged the jury on nine counts.  First, the judge first charged the jury on the elements of assault in the first degree under New York Penal Law §120.10(1).  That charge

11

explained that a person was guilty of assault in the first degree when, with intent to cause serious physical injury to another person, he causes such injury to that person by means of a dangerous instrument.  (T. 254.)  As part of that charge, the judge provided the jury with the statutory definitions of the terms "serious physical injury," "intent," and "dangerous instrument."  (T. 254.)  However, Justice Kron did not advise the jury that the first count of the indictment charged that the dangerous instrument at issue in this case was a knife.  The judge then charged the jury on the statutory definition of "attempt," noting that the prosecution had to prove both that petitioner intended to commit the crime of assault in the first degree and that he engaged in conduct which "tend[ed] to effect the commission of the crime."  (T. 254.)

Justice Kron subsequently charged the jury on four other offenses:  assault in the second degree, criminal possession of a weapon in the fourth degree, assault in the third degree, and witness tampering in the third degree.  Because the indictment charged multiple counts of the first three of these offenses, the judge had to differentiate the counts that charged the same offense.  For example, in differentiating the second and third counts – both of which charged petitioner with committing assault in the second degree by causing physical injury by means of a dangerous instrument – the judge noted that the dangerous instrument named in the second count was a knife and that the dangerous instrument charged in the third count was the instrument used to burn Hearns.  (T. 256–57.)  Similarly, in differentiating the fourth and fifth counts – both of which charged petitioner with committing criminal possession of a weapon in the fourth degree by possessing a dangerous knife or other dangerous instrument or weapon with intent to use it against another person – the judge noted that the fourth count charged possession of a knife, while the fifth count charged possession of the instrument used to burn Hearns.  (T. 257–59.)  Finally, in differentiating the sixth, seventh, and eight counts – all of which charged petitioner

12

with committing assault in the third degree by causing physical injury to another – the judge noted that the sixth count charged petitioner with punching Hearns, that the seventh count charged petitioner with putting his elbow on her neck, and that the eighth count charged petitioner with grabbing Juan by the neck.  (T. 259–62.)

The jury convicted petitioner of seven of the nine counts charged.  (T. 275–76.)  The jury found petitioner not guilty of the seventh count, which charged petitioner with committing assault in the third degree by forcing his elbow into Hearns' neck, and not guilty of the ninth count, which charged him with witness tampering.  (T. 276.)

At sentencing on July 15, 2010, the prosecution argued that petitioner was a second felony offender by virtue of a 1999 conviction for robbery in the third degree, for which petitioner was sentenced to 2 to 4 years' imprisonment.  (S. 5.)[2]  For reasons which are unclear, Justice Kron did not arraign petitioner as a predicate felon but simply held that petitioner "would be a predicate on this case."  (S. 5.)  Justice Kron then sentenced petitioner to 12 years' imprisonment and 5 years of post-release supervision on the top count, 7 years' imprisonment and 5 years of post-release supervision on the two second-degree assault counts, and one year of imprisonment on the remaining counts.  (T. 13.)  All sentences were run concurrently.  (T. 13.)

One week later, petitioner was arraigned as a second felony offender before another judge, James Griffin.  Petitioner refused to admit that he was the person who had been convicted of robbery in the third degree, so the arraignment was adjourned to permit the prosecution time to obtain a certified copy of the judgment of conviction.  Less than a week later, petitioner was

---

[2] Numbers in parentheses preceded by "S" refer to pages in the transcript of the July 15, 2010, sentencing.  That transcript appears in Doc. No. 8-1, beginning on page 461.

again arraigned as a predicate felon.  This time, defense counsel had discussed the predicate

offense with petitioner and Justice Griffin had a copy of the court file relating to that offense.

 According to defense counsel, petitioner had been arrested on August 7, 1998, on charges

of robbery in the second degree.  (SS. 3.)[3]  On August 23, 1999, petitioner had pled guilty to the

robbery charge on the understanding that he would be placed in a drug treatment program.  (SS.

3, 7.)  Under the plea agreement, the charges would be dismissed if petitioner successfully

completed the program.  (SS. 7.)

 Although petitioner told defense counsel that he had completed the program, (SS. 3), the

court file suggested otherwise.  According to the file, he was sentenced on May 21, 2003, to 3½–

7 years' imprisonment.  (SS. 6.)  However, following sentencing, the Court inspected the grand

jury minutes and reduced the top count to robbery in the third degree.  (SS. 6.)  On June 4, 2003,

petitioner was allowed to withdraw his guilty plea and replead to that lesser offense, and was

then re-sentenced to 2-4 years' imprisonment.  (SS. 6.)  Based on these facts, Justice Griffin

adjudicated petitioner a predicate felon.  (SS. 8.)

Direct Appeal

 Lynn W.L. Fahey of Appellate Advocates was assigned to represent petitioner on direct

appeal.  Thereafter, Jessica M. McNamara, a lawyer associated with Ms. Fahey, drafted a brief

raising four points.  The first point argued that the evidence was insufficient to establish that

petitioner either caused or intended to cause serious physical injury to Hearns, and that his

conviction for attempted assault in the first degree was against the weight of the evidence.  The

second point argued that petitioner was denied his right to fair notice of the charges against him

---

[3] Numbers in parentheses preceded by "SS" refer to pages in the transcript of the July 28, 2010, proceedings before Justice Griffin.  That transcript appears in Doc. No. 8-1, beginning on page 478.

14

and to be indicted on those charges when the trial court instructed the jury that it could convict petitioner of attempted assault in the first degree if it found that he intended to cause serious physical injury by means of a dangerous instrument, rather than by means of a knife as charged in the indictment.  The third point argued that petitioner's convictions for the second- and third-degree assault of Hearns were multiplicitous because the indictment charged a single, continuous assault.  The fourth point argued that the evidence did not establish that petitioner caused physical injury to his son and was, therefore, insufficient to support his conviction for the third-degree assault of Juan.

The Appellate Division agreed with petitioner on the fourth point, holding that the evidence was insufficient to establish assault in the third degree with respect to Juan.  However, finding that the evidence was sufficient to establish the lesser included offense of attempted assault in the third degree, the Court reduced his conviction under that count to attempted assault in the third degree.

The Appellate Division rejected petitioner's remaining arguments and affirmed his conviction, as modified.  The Court specifically addressed petitioner's first point, finding that the evidence, viewed in the light most favorable to the prosecution, was legally sufficient to prove petitioner guilty of attempted assault in the first degree beyond a reasonable doubt and that the verdict of guilt as to that count was not against the weight of the evidence.  The Court also addressed the third point, holding that it was unpreserved for appellate review and, "in any event, without merit."  (SR. 121.)[4]  The Court did not specifically address the second point, other than to state that petitioner's "remaining contention" was also "without merit."  (SR. 121.)

---

[4] Numbers in parentheses preceded by "SR" refer to pages in the State Court Record (Doc. No. 8.)

Petitioner sought leave to appeal to the New York Court of Appeals. In a leave letter dated November 8, 2013, appellate counsel specifically requested that petitioner be granted leave to appeal on the federal constitutional issues raised in the Appellate Division brief. (SR. 127.) The leave letter implied that the second and third points raised a Sixth Amendment ineffective assistance of counsel issue relating to trial counsel's failure to object to the jury instructions or to object to the multiplicitous counts. (SR. 127.) In fact, no such issue was mentioned in either the appellate brief or in appellate counsel's reply. The Court of Appeals denied petitioner leave to appeal on November 22, 2013. (SR. 129.) Petitioner did not petition the Supreme Court for a writ of certiorari, so his judgment of conviction became final on February 20, 2014.

The First Post-Conviction Motion

On May 22, 2014, petitioner filed a *pro se* motion to vacate his conviction pursuant to New York Criminal Procedure Law ("CPL") § 440.10. The Court construes that motion as raising six arguments, some of which contain two or more related points. First, petitioner maintained that Hearns' trial testimony was false in various respects because certain details of that testimony were not included in Hearns' prior statements or grand jury testimony. (SR. 136–37.) Petitioner contended that the prosecutor, who had access to the prior statements and grand jury transcripts, knew of this perjury, but took no action. (SR. 136–37.)

Second, petitioner argued that the trial court, aware of the perjury and intent on covering it up, interfered with defense counsel's cross-examination of Hearns by refusing to allow impeachment using prior inconsistent statements. (SR. 139.) Indeed, petitioner alleged that Justice Kron and the prosecutor told defense counsel at a sidebar conference that they did not want Hearns impeached on her allegedly perjurious statements. (SR. 139.) Petitioner – who waived his *Antommarchi* rights and was not present at the sidebars, (PT. 7) – does not

16

specifically identify the statements.[5]  Petitioner did, however, cite to page 161–64 of the trial transcript, in which petitioner questioned the court's decision not to permit the documents containing these prior inconsistent statements to be introduced in evidence.  (SR. 139.)

Third, petitioner asserted that Officer Ward conducted an unlawful search of petitioner's residence, during which he seized the butcher knife and took photographs that were later introduced at trial.  (SR. 144.)  According to petitioner, Ward never obtained permission to search and never applied for a warrant, but used the keys petitioner had in his possession when he was taken into custody.  (SR. 144.)  Petitioner argued that the knife should have been suppressed but was later introduced at trial, where the prosecution falsely claimed that it was the weapon that caused Hearns' injuries.  (SR. 145–46.)

Fourth, petitioner made various arguments relating to the recordings of the telephone calls that petitioner made from jail prior to his trial.  Petitioner argued that the prosecution had unlawfully obtained these recordings and failed to disclose them to defense counsel, in violation of obligations under *Brady* and *Rosario*.  (SR. 147.)  Petitioner also claimed that the prosecutor listened to privileged conversations that petitioner had with his attorney and that she did not disclose the existence of the recording that was played at trial until the pre-trial *Sandoval* hearing.  (SR. 147.)  In addition, petitioner claimed that the prosecution had failed to authenticate or lay a foundation for the introduction of that audio recording.  (SR. 132.)

Fifth, petitioner asserted that trial counsel provided ineffective assistance in various respects.  Petitioner faulted the manner in which trial counsel impeached Hearns and Officer Ward and his failure to recall the officer for the sole purpose of introducing prior inconsistent

---

[5] Numbers in parentheses preceded by "PT" refer to the transcript of the pre-trial proceedings on June 22, 2010, (Doc. No. 8-1 at 1.)

statements.  (SR. 148–49.)  He also faulted trial counsel for failing to object when the trial judge

and prosecutor allegedly told him not to impeach Hearns.  (SR. 153.)  In addition, petitioner

argued that trial counsel provided ineffective assistance because he failed to move to suppress

the butcher knife and photographs taken at the duplex, claiming that the People could not have

obtained a conviction on the top count without this evidence.  (SR. 154–55.)  Similarly,

petitioner faulted trial counsel for failing to move to suppress the records of his telephone

conversations, to object to the introduction of the recording for lack of authentication and failure

to lay a foundation, or to argue that these conversations should have been disclosed as *Brady* or

*Rosario* material.  (SR. 157–58.)  Petitioner also argued that trial counsel failed to tell petitioner

that he had received copies of the conversation in which petitioner told his brother that he only

stabbed Hearns "a little."  (SR. 159.)  Finally, petitioner argued that trial counsel should have

objected to the multiplicitous indictment and to that portion of the jury charge which instructed

the jury that it could convict petitioner of attempted assault in the first degree if it found that he

intended to cause serious physical injury by means of a dangerous instrument.  (SR. 161–63.)

Sixth, petitioner argued that the court's sentence was unlawful and excessive.  Petitioner

reasoned that because he was sentenced to concurrent terms of incarceration totaling 12 years

and to concurrent terms of supervised release totaling 5 years, he was actually sentenced to 17

years' incarceration – two years more than the maximum permissible.  (SR. 166–67.)  Petitioner

also argued that he was improperly adjudicated a second violent felony offender and that post-

release supervision is unconstitutional.  (SR. 167–68.)  Finally, petitioner argued that his

sentence was unduly harsh.  (SR. 170.)

The People opposed this motion.  First, the prosecution argued that all grounds were

procedurally barred by operation of CPL § 440.10(2)(c), which requires a court to deny a §

440.10 claim that could have been raised on direct appeal.  (SR. 201–02.)  The prosecution also

argued, in the alternative, that each of the grounds lacked merit.

In an opinion dated October 15, 2014, Justice Kron agreed with the People, holding that

all of the claims raised in the § 440 motion were "procedurally barred and without merit."  (SR.

239.)  With respect to the procedural bar, Justice Kron first quoted § 440.10(2)(c), and noted that

a "motion to vacate a judgment of conviction is not intended to operate as an alternative for a

direct appeal when the record is sufficient to permit appellate review."  (SR. 239.)   He then

expressly held that petitioner's second, third, fourth, and fifth claims were "on the record

claims," and concluded, "[f]or this procedural reason, [petitioner's] application is denied."  (SR.

239–40.)

Notwithstanding this holding, Justice Kron also examined the merits of petitioner's

claims, stating, "In any event, all of the defendant's claims must be denied on the merits."  (SR.

239–40.)  The judge's 11-page opinion, which specifically addressed almost every claim

petitioner made, is described in more detail in the discussion below.  Petitioner sought leave to

appeal Justice Kron's ruling to the Appellate Division, but leave was denied on July 24, 2015.

<u>The Application for a Writ of Error Coram Nobis</u>

On March 5, 2015, petitioner filed an application for a writ of error coram nobis in the

Appellate Division, alleging ineffective assistance of appellate counsel.  Petitioner claimed 1)

that appellate counsel failed to raise "the proper arguments" and 2) that he was prejudiced when

McNamara resigned and was replaced by another Appellate Advocates attorney, Kendra L.

Hutchinson, two weeks prior to oral argument.  (SR. 312.)  With respect to the first of these

claims, petitioner largely argued that appellate counsel should have raised the same arguments he

listed in his § 440 motion.  However, petitioner also faulted the manner in which appellate

19

counsel fashioned the weight of the evidence argument contained in the first point of the appellate brief, asserting that she omitted some facts which would have been persuasive.

In their opposition papers, the People submitted a nine-page affirmation from Hutchinson, explaining why Appellate Advocates had elected not to raise the issues set forth in petitioner's § 440 motion.  (SR. 403–11.)  Hutchinson also stated that, after conferring with McNamara about the case and reviewing the file and the record on appeal, she felt "fully familiar with the facts and the law involved at oral argument."  (SR. 406.)  Petitioner filed a response to that affirmation, contesting appellate counsel's decision as to what issues to raise and asserting that ten days was an inadequate time to prepare for oral argument because it had taken McNamara three years to prepare the appellate brief.  (SR. 413–19.)

On December 9, 2015, the Appellate Division denied petitioner's application.  The court held, without further elaboration, that petitioner had "failed to establish that he was denied the effective assistance of appellate counsel."  (SR. 444.)  Petitioner then sought leave to appeal the Appellate Division's decision to the New York Court of Appeals, (SR. 445–53), but leave was denied on June 29, 2016.  (SR. 459.)

The Instant Petition

In September 2016, petitioner filed the instant *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (the "Petition"), raising a total of 20 grounds for relief.  The Court construes the first three grounds as raising the issues raised in the first three points of the appellate brief and construes 15 of the remaining 17 grounds as attempts to raise issues that were incorporated into the two post-conviction motions.  The fourth ground – that "[i]llegally obtained evidence was used" at trial – is essentially the same as the third point raised in the § 440 motion: namely, that Officer Ward conducted an unlawful search of petitioner's home.  The sixth,

seventh, and eighth grounds – arguing that the prosecution did not authenticate or lay a foundation for the introduction of the audio recording of petitioner jailhouse call with his brother, unlawfully obtained the recording of his telephone calls, failed to disclose these recordings and listened to privileged calls with his attorney – were included in the fourth point raised in the § 440 motion.  The ninth and tenth grounds – arguing that the prosecutor used "false and perjured evidence" and that the trial court impeded defense counsel's cross-examination of Hearns – are essentially the same as the first and second arguments raised in the § 440 motion.

Grounds Eleven through Sixteen and Twenty allege ineffective assistance of trial counsel on grounds that were incorporated into the fifth argument raised in the § 440 motion.  The eighteenth ground raises the sentencing issues set forth in the sixth argument of the § 440 motion and the nineteenth ground alleges ineffective assistance of appellate counsel on the same grounds set forth in the application for a writ of error coram nobis.

However, two of the grounds for habeas corpus relief appear to rely on arguments that were not raised on direct appeal or in the post-conviction motions.  The fifth ground argues that the prosecutor improperly introduced evidence of an uncharged crime by placing the butcher knife in evidence and arguing that petitioner had threatened Hearns with it.  Similarly, Ground Seventeen alleges ineffective assistance of trial counsel for failure to object to a prosecution argument relating to the butcher knife.  Although petitioner claims that these grounds were exhausted in his application for a writ of error coram nobis, that application alleged only ineffective assistance of appellate counsel.

In its response to the Petition, respondent argues that Grounds Four and Eight through Seventeen are procedurally barred because Justice Kron denied these claims on independent and adequate state grounds.  In addition, respondent argues that Ground Three, raising an argument

which the Appellate Division found to be unpreserved, is also procedurally barred.  Respondent

does not argue that any of the grounds are unexhausted and addresses all of the arguments on the

merits.

## STANDARD OF REVIEW

In 1996, Congress passed the Antiterrorism and Effective Death Penalty Act ("AEDPA"),

P.L. No. 104–32, 110 Stat. 1214, which restricted the ability of federal courts to grant writs of

habeas corpus to state prisoners and granted greater deference to state court determinations of

both law and fact.  Under AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an
> > unreasonable application of, clearly established Federal law, as
> > determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable
> > determination of the facts in light of the evidence presented in the
> > State court proceeding.

28 U.S.C. § 2254(d).  "'Clearly established Federal law' means 'the holdings, as opposed to the

dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'"

*Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362,

412 (2000)).  A decision is "contrary to" clearly established Federal law "if the state court arrives

at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the

state court decides a case differently than [the Supreme Court] has on a set of materially

indistinguishable facts."  *Williams*, 529 U.S. at 413.  A decision is an "unreasonable application"

of clearly established Federal law if a state court "identifies the correct governing legal principle

from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.*

As the Supreme Court has acknowledged, the standard set forth in § 2254(d) was meant to be difficult to meet. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102–03 (internal quotations marks and citation omitted). Thus, in order to obtain a writ of habeas corpus from a federal court, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. This is a "highly deferential standard," requiring that state courts "be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010).

Where a state court's decision is unaccompanied by an explanation, a habeas petitioner has the burden of "showing there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98. In such cases, a habeas court "'must determine what arguments or theories ... could have supported the state court's' determination ...." *Shinn v. Kayer*, 141 S. Ct. 517, 524 (2020) (quoting *Harrington*, 562 U.S. at 102.) The court then "must assess whether fairminded jurists could disagree on the correctness of the state court's decision if based on one of those arguments or theories." *Id.* (internal quotation marks and citations omitted).

A federal court may review a petition for a writ of habeas corpus only to the extent that the petitioner has "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). This means that a "federal habeas court generally may consider a state prisoner's federal claim only if he has first presented that claim to the state court in accordance with state

procedures." *Shinn v. Ramirez*, 142 S. Ct. 1718, 1727 (2022).  "When the prisoner has failed to do so, and the state court would dismiss the claim on that basis, the claim is 'procedurally defaulted.'"  *Id.* at 1727–28.  But AEDPA provides that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(2).

It is also "well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'"  *Cone v. Bell*, 556 U.S. 449, 465 (2009) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).  "This is true even where … the state court 'reach[es] the merits of a ... claim in an *alternative* holding.'"  *McPherson v. Keyser*, No. 20-161-PR, 2021 WL 4452078, at *2 (2d Cir. Sept. 29, 2021) (summary order) (quoting *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990)) (emphasis in *Velasquez*).  However, federal habeas review is not "barred every time a state court invokes a procedural rule to limit its review of a state prisoner's claims."  *Cone*, 556 U.S. at 465.  As discussed below, "'[t]he adequacy of state procedural bars to the assertion of federal questions' ... is not within the State's prerogative finally to decide; rather, adequacy 'is itself a federal question.'"  *Id.* (quoting *Lee v. Kemna*, 534 U.S. 362, 375 (2002)).  Under federal law, state rules are considered "adequate" if they are "firmly established and regularly followed."  *Johnson v. Lee*, 578 U.S. 605, 606 (2016) (quoting *Walker v. Martin*, 562 U.S. 307, 316 (2011)).  But there are "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question."  *Lee*, 534 U.S. at 376.

Generally, "[t]o overcome procedural default, the prisoner must demonstrate 'cause' to excuse the procedural defect and 'actual prejudice' if the federal court were to decline to hear his

claim." *Ramirez*, 142 S. Ct. at 1728 (quoting *Coleman*, 501 U.S. at 750).  In addition, in

"exceptional cases involving a compelling claim of actual innocence, … the state procedural

default rule is not a bar to a federal habeas corpus petition."  *House v. Bell*, 547 U.S. 518, 522

(2006) (citing *Schlup v. Delo*, 513 U.S. 298, 319–22 (1995)).  Since there is no compelling claim

of actual innocence in this case, the discussion below focuses only on the cause and prejudice

standard.

## DISCUSSION

I.   Procedural Bars

A.  Exhaustion

Several of petitioner's grounds for habeas corpus relief appeared to be procedurally

barred.  First, two of grounds appear to be unexhausted.  The Petition alleges that the fifth

ground, which raises a prosecutorial misconduct argument, and the seventeenth ground, which

raises a claim of ineffective assistance of trial counsel, were exhausted via the writ of error

coram nobis.  But the application for a writ of error coram nobis raised only a claim of

ineffective assistance of appellate counsel, not claims of prosecutorial misconduct or ineffective

assistance of trial counsel.

Respondent does not argue that these grounds are procedurally barred, but instead

addresses them on the merits.  The Court will do so as well.  The fifth ground – which argues

that the prosecutor engaged in misconduct by introducing the large knife and arguing that

petitioner had threatened Hearns with it – is premised on the mistaken view that the large knife

was only evidence of the uncharged crime of criminal possession of a weapon in the fourth

degree.  While petitioner is correct in noting that he was never charged with possessing this

knife, Hearns testified that petitioner displayed the knife during the assault and said he would not

use it because it would kill her faster.  As discussed in more detail below, this evidence was crucial because it permitted the inference that petitioner intended to seriously injure Hearns but had decided to torture her first.  Accordingly, the prosecutor did not act improperly in introducing the large knife and evidence relating to petitioner's possession of it.

In the seventeenth ground, petitioner asserts that trial counsel provided ineffective assistance because he failed to object to the introduction of the large knife.  For the reasons explained above, the introduction of the large knife was not objectionable.  Accordingly, defense counsel's decision not to object to the introduction of the knife was correct.

B.  Independent and Adequate State Grounds

Several of petitioner's grounds for habeas corpus relief raise arguments that were rejected by state courts on independent and adequate state grounds.  First, Ground Three – asserting that petitioner's conviction for second- and third-degree assault violates double jeopardy – raises an argument that the Appellate Division denied as "unpreserved," thereby invoking the contemporaneous objection rule set forth in CPL § 470.05(2).  In addition, Grounds Four, Eight, and Ten through Sixteen were denied by Justice Kron pursuant to CPL § 440.10(2)(c) on the ground that they could have been raised on direct appeal.

1.  The Contemporaneous Objection Rule

"New York's contemporaneous objection rule 'require[s] at the very least, that any matter which a party wishes the appellate court to decide have been brought to the attention of the trial court at a time and in a way that gave the latter the opportunity to remedy the problem and thereby avert reversible error.'"  *Hamilton v. Lee*, 707 F. App'x 12, 14 (2d Cir. 2017) (summary order) (quoting *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999)).  "The New York courts' application of their rules regarding the preservation of legal issues for appellate review in

26

criminal cases … constitute independent and adequate state grounds ….”  *McPherson*, 2021 WL 4452078, at *2; *see also Garvey v. Duncan*, 485 F.3d 709, 720 (2d Cir. 2007) (“[T]he procedural bar of § 470.05(2) constitutes an independent and adequate state ground for the Appellate Division’s holding.”).  First, “there is no question” that the failure to comply with New York’s contemporaneous objection rule “constitutes an ‘independent’ state ground of decision.”  *Cotto v. Herbert*, 331 F.3d 217, 239 (2d Cir. 2003)).  Second, “in accordance with New York case law, application of the state’s preservation rule is adequate – *i.e.*, firmly established and regularly followed.”  *Richardson v. Greene*, 497 F.3d 212, 219 (2d Cir. 2007).

This is not one of those exceptional cases “in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question.”  *See Lee*, 534 U.S. at 376.  In determining whether a case falls “within that limited category,” *id.*, a court considers “(1) whether the alleged procedural violation was actually relied on in the [state] court, and whether perfect compliance with the state rule would have changed the [state] court’s decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had ‘substantially complied’ with the rule ….”  *Cotto*, 331 F.3d at 240.  Here, as appellate counsel conceded, trial counsel did not raise the multiplicity issue and therefore failed to substantially comply with the contemporaneous objection rule.  (SR. 35.)  The Appellate Division expressly relied on the rule, denying petitioner’s multiplicity claim as unpreserved.  *People v. Mighty*, 971 N.Y.S.2d 54, 55 (N.Y. App. Div. 2013).  And the New York Court of Appeals has held that multiplicity claims must be preserved for appellate review.  *People v. Allen*, 24 N.Y.3d 441, 448–50 (N.Y. 2014).

Petitioner has not demonstrated cause for the default and actual prejudice as a result of the alleged violation of federal law.  “There is no doubt that ineffective assistance of counsel can

serve as cause to excuse a procedural default." *Tavarez v. Larkin*, 814 F.3d 644, 650 (2d Cir. 2016) (citing *Edwards v. Carpenter*, 529 U.S. 446, 450–51 (2000)).  Petitioner's § 440 motion argues that his trial counsel provided ineffective assistance because he failed to object to the "duplicity of the charges in the indictment."  (SR. 161.)  To be sure, duplicity is not synonymous with multiplicity.[6]  Yet, in light of petitioner's *pro se* status, the Court construes this argument as asserting that trial counsel was ineffective is failing to preserve the argument that the indictment was multiplicitous.

However, the Appellate Division found that this argument was not only unpreserved, but also "without merit."  (SR. 121.)  Accordingly, petitioner must also establish that this determination was an unreasonable application of clearly established Supreme Court law.  *See Tavarez*, 814 F.3d at 650.  Petitioner cannot do so because the charges of second-degree assault and third-degree assault as to Hearns were not multiplicitous.

"An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when in law and fact, only one crime has been committed."  *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999).  The Supreme Court has established the following test for determining whether an indictment is multiplicitous:  "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."  *Blockburger v. United States*, 284 U.S. 299, 304 (1932).  In other words, courts "ask 'whether each charged offense contains an element not contained in the

---

[6] A count is duplicitous if it charges two statutory violations.  *See* Fed. R. Crim. P. 8(a); *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001).  Counts are multiplicitous if they both charge the same statutory violation.  *See United States v. Jones*, 482 F.3d 60, 72 (2d Cir. 2006).

other charged offense.'" *United States v. Villa*, 744 F. App'x 716, 720 (2d Cir. 2018) (summary order) (quoting *Chacko*, 169 F.3d at 146).

The two second-degree assault charges (Counts II and III) and the third-degree assault charge relating to Hearns (Count VI) all have unique elements.  The second-degree assault charge in Count II required proof that petitioner caused the physical injury by means of a knife, while the other second-degree assault charge required proof that the physical injury was caused by "whatever was used to … burn" her.  (T. 256–57.)  The third-degree assault charge required proof that petitioner caused physical injury to Hearns not by means of a weapon but by punching her.  (T. 259–60.)  Since all three charges had a unique element, they were not multiplicitous.  The Petition's third ground for habeas corpus relief is therefore both procedurally barred and meritless.

2.   New York Criminal Procedure Law § 440.10(2)(c)

In denying petitioner's § 440 motion, Justice Kron expressly held that several grounds were procedurally barred by CPL § 440.10(2)(c).  At the time Justice Kron denied petitioner's § 440 motion, § 440.10(2)(c) required a court to deny a motion to vacate a judgment when "[a]lthough sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal during the prescribed period or to his unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him …."  According to Justice Kron, many of the claims raised in the § 440 motion were based "on the record":  1) the claims "regarding the complainant's testimony," including the claims that although the trial court knew Hearns' testimony was false, it not only admitted the claims but

also interfered with defense counsel's cross-examination of Hearns; 2) the claims that the

prosecutor violated *Brady* and *Rosario* by withholding recordings of petitioner's telephone calls

from prison, committed misconduct by listening to petitioner's calls with defense counsel, and

failed to even disclose the existence of these recordings until the *Sandoval* hearing; 3) the claim

that the police illegally seized the butcher knife and other evidence from the duplex; and 4) the

ineffective assistance claims.  (SR. 239–40.)  These procedurally barred claims serve as the basis

for eleven of the Petition's twenty grounds for habeas corpus relief: namely, Grounds Four, Eight

through Sixteen, and Twenty.

In some circumstances, a trial court's denial of a record-based claim pursuant to CPL §

440.10(2)(c) can constitute an independent and adequate state ground, subjecting the claim to

procedural default.  *See Sweet v. Bennett*, 353 F.3d 135, 141 (2d Cir. 2003); *Levine v. Comm'r of

Corr. Servs.*, 44 F.3d 121, 126 (2d Cir. 1995).  For example, when an ineffective assistance of

counsel "claim is based on matters that appear all over the face of the trial record," application of

§ 440.10(2)(c) may constitute an adequate state procedural bar to habeas review of that claim.

*Clark v. Perez*, 510 F.3d 382, 393 (2d Cir. 2008).  However, the Second Circuit has held that

application of § 440.10(2)(c) to a "mixed claim" of ineffective assistance is "exorbitant,"

rendering the state ground inadequate to preclude a district court from consideration of a federal

question."  *See Pierotti v. Walsh*, 834 F.3d 171, 178–79 (2d Cir. 2016); *see also Fulton v.

Graham*, 802 F.3d 257, 263 (2d Cir. 2015).  Under New York law, a "mixed claim" is one in

which "some of the defendant's allegations of ineffectiveness involve matters appearing on the

record, while others involve matters that are outside the record."  *Pierotti*, 834 F.3d at 178 (citing

cases).  Where "a defendant presents a mixed claim of ineffective assistance … [a §] 440.10

proceeding is the appropriate forum for reviewing the claim of ineffectiveness in its entirety." *Id.* at 178–79 (citing state cases.)

Petitioner's ineffective assistance of counsel claim was a mixed claim.  According to Justice Kron, the § 440 motion alleged, among other things, that trial counsel failed to inform petitioner that he had received a copy of the recording that was introduced at trial, failed to let petitioner hear that recording prior to trial, and failed to investigate and prepare for trial.  (SR. 237.)  Since these allegations involved matters "outside the record," petitioner had to raise his ineffective assistance argument in a § 440 motion.  *See Pierotti*, 834 F.3d at 178.  Accordingly, the Court finds that Justice Kron's reliance on § 440.10(2)(c) in denying petitioner's ineffective assistance claim does not constitute an adequate state procedural bar to habeas review of Grounds Eleven through Sixteen and Twenty.

In contrast, the Court finds that § 440.10(2)(c) constitutes an adequate state procedural bar to habeas review of Grounds Four, Eight, Nine, and Ten.  These four claims were based on facts that appeared on the face of the trial record.  Ground Four was based on Ward's testimony that he had performed a warrantless search of the duplex.  Ground Eight was based on the fact that the prosecution had provided only one of many recordings of telephone conversations petitioner had while in jail.  Grounds Nine and Ten were both based on events that occurred at trial.  The Court finds that these four grounds were procedurally barred.

"Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent."  *Clark*, 510 F.3d at 393 (quoting *Bousley v. United States*, 523 U.S. 614, 622 (1998)).  Since actual innocence is not in issue here, petitioner must establish cause by showing "that some objective factor external to the defense impeded …

efforts to comply with the State's procedural rule." *Id.* (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  The Court sees only one potential cause for the default that petitioner could allege: ineffective assistance of appellate counsel.  However, for the reasons explained in section II(G) below, the Court finds that appellate counsel was not ineffective.  Accordingly, Grounds Four, Eight, Nine, and Ten are procedurally barred and need not be reviewed on the merits.

   II.    Merits Analysis

      A.    Sufficiency of the Evidence

   Ground One of the Petition essentially repeats the claims raised in Point I of petitioner's appellate brief: that the evidence was insufficient to prove petitioner's intent to cause serious physical injury to Hearns and that his conviction for attempted assault in the first degree was against the weight of the evidence.  "[T]he argument that a verdict is against the weight of the evidence states a claim under state law, which is not cognizable on habeas corpus[.]"  *McKinnon v. Superintendent, Great Meadow Corr. Facility*, 422 F. App'x 69, 75 (2d Cir. 2011) (summary order) (citing cases).  Thus, the Court need only consider the issue of whether the evidence was sufficient to prove petitioner's intent.

   Sufficiency claims "face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference."  *Coleman*, 566 U.S. at 651.  On direct appeal, a reviewing court cannot "intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'"  *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  The reviewing court considers only the question of "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319

(emphasis in original).  "[O]n habeas review, 'a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.'"  *Coleman*, 566 U.S. at 651 (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011).  Rather, the "federal court … may do so only if the state court decision was 'objectively unreasonable.'"  *Id.*

In this case, the Appellate Division held that the evidence, viewed in the light most favorable to the prosecution, permitted the inference that petitioner intended to cause Hearns "serious physical injury."  Under New York law, "'serious physical injury' means physical injury which creates a substantial risk of death, or which causes death, or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ."  N.Y. Penal Law § 10.00(10).

Hearns testified that, at the start of the incident, petitioner entered her bedroom with a butcher knife and a steak knife and asked which one she wanted.  (T. 95.)  When Hearns asked what he was talking about, petitioner stated that he would not use the butcher knife because it would kill her faster but would instead use the steak knife because he wanted to torture her.  (T. 95.)  The jury could infer from this testimony that petitioner intended to cause injuries which would cause death or a substantial risk of death, but wanted to torture her first.  The jury was also entitled not to credit petitioner's testimony that he was so intoxicated that he could not form the requisite intent.

As petitioner correctly notes, there is no evidence that he actually caused serious physical injury to Hearns.  For that reason, he was not charged with the completed crime of assault in the first degree but only with an attempt to commit that crime.  In order to be guilty of an attempt, "the defendant must have engaged in conduct that came dangerously near commission of the

completed crime." *United States v. Tyrell*, 840 F. App'x 617, 621 (2d Cir. 2021) (summary order) (quoting *People v. Naradzay*, 11 N.Y.3d 460, 466 (2008). "The 'dangerously near' standard does not, however, mandate that the defendant take 'the final step necessary' to complete the offense." *Naradzay*, 11 N.Y.3d at 466 (citing cases).

In this case, both Hearns and Juan testified that petitioner stopped assaulting Hearns only after Juan banged on the bedroom door. Given petitioner's statement prior to commencing the assault, the jury could reasonably infer that petitioner would have caused serious physical injury to Hearns had he not been interrupted. Admittedly, this is not the only inference that could have been drawn. However, the Appellate Division held that the evidence was sufficient to prove attempted assault in the first degree beyond a reasonable doubt and the Court cannot find that the Appellate Division's holding was objectively unreasonable.

B. Constructive Amendment of the Indictment

Ground Two of the Petition repeats the claims raised in Point II of the appellate brief: that in charging the jury on the attempted assault charge, the trial court constructively amended the indictment and deprived petitioner of his right to be tried only on charges voted by the grand jury and his right to fair notice of the charges against him. Petitioner does not cite any federal law or constitutional violations as a basis for Ground Two, but Point II of his appellate brief cited to the Fifth and Sixth Amendments. In light of petitioner's *pro se* status, the Court construes Ground Two to invoke the Fifth Amendment's Grand Jury Clause and the Sixth Amendment's requirement that a criminal defendant be informed of the charges made against him. U.S. Const. amend. V; U.S. Const. amend. VI.

The Sixth Amendment guarantees a criminal defendant the right "to be informed of the nature and cause of the accusation" against him. U.S. Const. amend. VI. The Supreme Court

has held that an indictment is constitutionally sufficient "if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974) (citations omitted).  These requirements are satisfied if, for each of its counts, an indictment provides "notice of the time, place, and essential elements of the crime."  *Miller v. New York*, No. 15-CV-2741 (ENV)(LB), 2019 WL 1232085, at *4–5 (E.D.N.Y. Mar. 15, 2019) (internal citations and quotation marks omitted).  Since there is no doubt that Count One of petitioner's indictment met these constitutional requirements, there is no evidence of a Sixth Amendment violation in this case.

The Grand Jury Clause of the Fifth Amendment states that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury …."  U.S. Const. amend. V.  "[A]n indictment must 'contain the elements of the offense charged and fairly inform [the] defendant of the charge against which he must defend.'" *United States v. Dove*, 884 F.3d 138, 146 (2d Cir. 2018) (quoting *United States v. Bastian*, 770 F.3d 212, 217 (2d Cir. 2014)).

The Grand Jury Clause of the Fifth Amendment is "violated, and reversal is required, if the indictment has been constructively amended."  *United States v. Khalupsky*, 5 F.4th 279, 293 (2d Cir. 2021) (quoting *Dove*, 884 F.3d at 149).  "An indictment is constructively amended if either the 'proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment.'"  *United States v. Banki*, 685 F.3d 99, 118 (2d Cir. 2012) (quoting *United States v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005)).  "The charge has been so altered 'either where (1) an additional element, sufficient for conviction, is added, or (2) an

35

element essential to the crime charged is altered.'" *Khalupsky*, 5 F.4th at 293 (quoting *Dove*, 884 F.3d at 146).

"While [the Second Circuit] views constructive amendment as a *per se* violation of the Grand Jury Clause requiring reversal, it has 'consistently permitted significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial.'" *United States v. D'Amelio*, 683 F.3d 412, 417 (2d Cir. 2012) (citations omitted) (quoting *United States v. Rigas*, 490 F.3d 208, 228 (2d Cir. 2007)). "The 'core of criminality' of an offense involves the essence of a crime, in general terms; the particulars of how a defendant effected the crime falls outside that purview." *Id.* at 418. Where the indictment charges "a single course of conduct and the deviation … in the 'to wit' clause did not permit conviction for a functionally different crime, it cannot be said that the deviation … 'broaden[ed] the possible basis for conviction beyond that contained in the indictment.'" *Id.* at 423 (quoting *United States v. Patino*, 962 F.2d 263, 266 (2d Cir. 1992)).

"In contrast to constructive amendment, a 'variance' occurs 'when the charging terms of an indictment are unaltered, but the trial evidence proves facts materially different from those alleged in the indictment.'" *United States v. Muratov*, 849 F. App'x 301, 306 (2d Cir. 2021) (quoting *United States v. Agrawal*, 726 F.3d 235, 260 (2d Cir. 2013)). "Reversal is only warranted for a variance if the defendant shows both: (1) the existence of a variance, and (2) that substantial prejudice occurred at trial as a result." *United States v. Lebedev*, 932 F.3d 40, 54 (2d Cir. 2019). The Second Circuit has stated that courts should "reverse on account of a variance only if it prejudices the defendant by infringing on the substantial rights that indictments exist to protect – to inform an accused of the charges against him so that he may prepare his defense and to avoid double jeopardy." *United States v. Kaplan*, 490 F.3d 110, 129 (2d Cir. 2007). "A

36

defendant cannot demonstrate that he has been prejudiced by a variance where the pleading and the proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." *Id.*

While the Supreme Court has not reviewed cases with facts "materially indistinguishable" from those at bar, the Second Circuit has addressed some cases with similar facts. For example, in *United States v. D'Amelio*, 683 F.3d 412 (2d Cir. 2012), the Court considered the question of "whether it violated the Fifth Amendment Grand Jury Clause to allow the petit jury to find D'Amelio guilty of attempted enticement of a minor based on his use of either the telephone or the Internet when a 'to wit' clause in his indictment specified only the latter means of interstate commerce." *Id.* at 416. After noting that the answer to this question depended "on whether the circumstances … demonstrate a constructive amendment of the indictment or a mere variance in proof," the Court concluded that there had only been "at most a variance in proof." *Id.* The Court stated:

> The government's proof at trial did not modify an "essential element" of the alleged crime. The essential element at issue is D'Amelio's use of a "facility or means of interstate ... commerce," 18 U.S.C. § 2422(b), not the particular means that were used. Neither the indictment nor proof at trial showed that D'Amelio committed this by means of, for example, use of force, which would have modified an 'essential element' of the crime. Whether D'Amelio used the Internet or a telephone makes no difference under the relevant statute, … and "affect[ed] neither the [g]overnment's case nor the sentence imposed." *D'Amelio*, 683 F.3d at 422 (quoting *United States v. Knuckles*, 581 F.2d 305, 311 (2d Cir. 1978)).

*D'Amelio*, 683 F.3d at 422. Thus, the Court held that "it was not fatal to D'Amelio's conviction that the jury was instructed that both the telephone and Internet qualify as facilities of interstate commerce. *Id.* at 423.

The *D'Amelio* Court drew a parallel to other constructive amendment cases where courts "held that the specific means used by a defendant to effect his or her crime does not constitute an 'essential element' of the offense" and that "proof of specific means apart from those charged in the indictment does not constructively amend the indictment." *Id.* at 422.  In particular, the Court discussed *United States v. Dupre*, 462 F.3d 131 (2d Cir. 2006), a case in which the defendants were charged with wire fraud and conspiracy to commit wire fraud in an indictment that "included some preliminary, generally framed clauses that tracked the language of the charging statute, followed by a 'to wit' clause alleging a specific fraudulent transaction." *D'Amelio*, 683 F.3d at 422.  Only fraudulent transactions other than the one specifically mentioned in the "to wit" clause were proven at trial.  Nonetheless, *Dupre* held the indictment was not constructively amended because "the evidence at trial concerned the same elaborate scheme to defraud investors as was described in the indictment." *Dupre*, 462 F.3d at 140–41.  The *Dupre* Court found that the "description of the scheme in the indictment" had "put defendants on notice that the prosecution aimed to prove that defendants conspired in the Southern District of New York to fraudulently induce investors to transfer money by wire to defendants" during the relevant time period, *id.* at 141, and that the essential elements of the wire fraud crime involved wire transfers, not specific wire transfers.  *See id.* at 142–43.  The *Dupre* Court also cited with approval *United States v. Robison*, 904 F.2d 365, 369 (6th Cir. 1990), which upheld an 18 U.S.C. § 924(c) conviction where the indictment charged use of a .357 Magnum, but the proof showed use of a shotgun, reasoning that the specific type of firearm used by the conspirator was not an essential element of the crime.

In *United States v. Knuckles*, the defendant was indicted for conspiracy to distribute heroin, but the jury was instructed that they could convict the defendant for either heroin or

38

cocaine distribution.  *United States v. Knuckles*, 581 F.2d 305, 308 (2d Cir. 1978).  The defendant argued that the indictment was constructively amended by allowing a conviction for a controlled substance other than heroin, but the Second Circuit held that there was no meaningful variance because the only difference was the exact substance involved.  The Court noted that "the time, place, people, and object proved at trial [were] in all respects those alleged in … the indictment."  *Id.* at 311.

The facts of this case are similar to those in *D'Amelio*, *Dupre*, and *Knuckles*.  Count One of the indictment spelled out the essential elements of attempted assault in the first degree, charging that petitioner had attempted to cause serious physical injury to Hearns by means of a dangerous instrument.  Although the count included a "to wit" clause, specifying that the dangerous instrument was a knife, the specific means used by petitioner to effect the attempted assault did "not constitute an 'essential element' of the offense."  *See D'Amelio*, 683 F.3d at 422. Accordingly, the Court concludes that Justice Kron did not constructively amend the indictment by failing to limit the definition of "dangerous instrument" to a knife.

Although the Appellate Division did not articulate its reasons for finding the arguments raised in Point II of petitioner's appellate brief to be "without merit," (SR. 121), it could have reasonably found that this case involved "at most a variance in proof."  *See id.* at 416.  In addition, the Appellate Division could have found that petitioner did not establish "substantial prejudice" as a result of this variance.  *See Lebedev*, 932 F.3d at 54.  Count One put petitioner on notice that he was being charged with attempting to cause serious physical injury to Hearns in violation of New York Penal Law § 120.10(1) during the July 26, 2009, incident.  This count provided adequate notice of the charges, enabling petitioner to formulate a defense strategy.  Had petitioner been acquitted of the top count, the People could not have re-indicted him on the

attempted assault charge by merely alleging the use of a different dangerous instrument since, as argued in the Point III of petitioner's appellate brief, the instruments were used in the course of the same attempt to seriously injure Hearns.  Since petitioner never established that he was not informed of the charges against him to an extent that prevented him from preparing a defense and never established infringement of his rights against double jeopardy, petitioner never established a prejudicial variance.

    C.  <u>Admission of the Recording</u>

Ground Six of the Petition raises an evidentiary error, arguing that the prosecution did not authenticate or lay a proper foundation for the admission of the recording of the telephone call between petitioner and his brother.  "'[H]abeas corpus relief does not lie for errors of state law,' and that necessarily includes erroneous evidentiary rulings." *Scrimo v. Lee*, 935 F.3d 103, 114 (2d Cir. 2019) (quoting *Hawkins v. Costello*, 460 F.3d 238, 244 (2d Cir. 2006)).  Thus, "[m]erely showing that the state court admitted evidence in violation of state rules of evidence is not enough, for such a state court decision on state law, even if erroneous, is not an independent ground for the writ of habeas corpus to issue under AEDPA." *Griggs v. Lempke*, 797 F. App'x 612, 615 (2d Cir. 2020) (summary order).  Rather, a petitioner must "demonstrate that the state court's erroneous conclusions about New York evidence law were so egregious as to implicate the Fourteenth Amendment's guarantee of due process." *Evans v. Fischer*, 712 F.3d 125, 133 (2d Cir. 2013).

Where the petitioner argues that an evidentiary ruling violated his right to due process, "the question is whether the claimed error 'deprived [him] of a fundamentally fair trial.'" *Daniels v. Lee*, No. 17-CV-7922 (AT)(RWL), 2022 WL 1948524, at *12 (S.D.N.Y. June 6, 2022) (quoting *Zarvela v. Artuz*, 364 F.3d 415, 418 (2d Cir. 2004)) (emphasis omitted).  "The

standard [is] … whether the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985).  To meet this standard, the evidence "must have been 'crucial, critical, highly significant.'" *Id.* (quoting *Nettles v. Wainwright*, 677 F.2d 410, 414–15 (5th Cir. 1982).

The evidence of the telephone call between petitioner and his brother was not crucial, critical, or highly significant.  To be sure, the evidence did undercut petitioner's claim that he was too intoxicated to recall the incident.  But that claim was already undercut by petitioner's testimony that he recalled events before and after the incident in great detail.  For example, petitioner recalled the name of the therapist with whom he spoke briefly, that Hearns was making a turkey bologna sandwich when returned to the duplex, and that he was listening to "sad songs" after Hearns went upstairs to the bedroom.  (T. 180, 205.)  He also remembered many details regarding his arrest, including what the officers said to him.  (T. 180–81.)  In addition, he testified that he wrote Hearns "a lot of letters" following the incident, apologizing for his actions.  (T. 206.)

In light of this evidence undercutting the intoxication defense, the recording of the telephone call was not crucial evidence.  Indeed, the call furthered petitioner's claim that he did not intend to seriously injure Hearns because it suggested petitioner only intended to stab her "a little."  Accordingly, the Court cannot find that the claimed evidentiary error could have deprived petitioner of "a fundamentally fair trial," *see Zarvela*, 364 F.3d at 418; *Daniels*, 2022 WL 1948524, at *12, and therefore finds that petitioner's sixth ground for relief is meritless.

D. Recording of the Telephone Calls

Ground Seven of the Petition raises a claim of prosecutorial misconduct, asserting that the prosecution either directed the New York City Department of Corrections ("DOCS") to record petitioner's conversations or unlawfully obtained those recordings without a warrant. This ground is without merit for two reasons: the prosecution did not engage in any misconduct and, even if it had, the alleged misconduct did not deprived petitioner of a fundamentally fair trial.

First, the prosecution did not direct DOCS to record the conversations. As explained in *People v. Johnson*, 27 N.Y.3d 199 (N.Y. 2016), the Rules of the City of New York ("RCNY") permit inmates "to make calls during their incarceration, subject to [DOCS'] authority to listen to and monitor all calls not otherwise exempted or privileged." *Johnson*, 27 N.Y.3d at 202. Pursuant to this authority, DOCS has implemented an Operations Order which states that DOCS "'shall record all inmate telephone calls and retain these recordings,' with the exception of calls to inmates' attorneys and other persons similarly included in the Department's 'Do Not Record List.'" *Id.* at 203. Petitioner's telephone calls were recorded pursuant to this Operations Order, not pursuant to a prosecutorial request.

Second, the prosecutor did not need a warrant to obtain the recordings. The Operations Order permits New York City's District Attorneys' Offices to request a copy of an inmate's recorded call. *Id.* Those requests are adjudicated by DOCS' Deputy Commissioner for Legal Matters, not by a court. *Id.* at 204. Upon the Deputy Commissioner's approval of a request, the copy of the recording is turned over to the District Attorney's representative. *Id.* The New York Court of Appeals has held that DOCS does "not serve as an agent of the State" when it records the calls and makes recordings available to the prosecution in this manner. *Id.* at 206.

42

Even assuming that petitioner's claims of prosecutorial misconduct had any merit, the alleged misconduct could not serve as a basis for habeas corpus relief.  Under the "'clearly established' law governing prosecutorial misconduct claims … on federal habeas review, the relevant standard is 'the narrow one of due process, and not the broad exercise of supervisory power.'" *Jackson v. Conway*, 763 F.3d 115, 146 (2d Cir. 2014) (quoting *Darden v. Wainwright*, 477 U.S. 168, 180 (1986)).  "Thus, while the State has a 'duty to refrain from improper methods calculated to produce a wrongful conviction,' such methods will warrant habeas relief only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process ….'" *Id.* (internal citation omitted).  As explained in the preceding section, the recording of the conversation between petitioner and his brother – the only recording played at trial – was not crucial evidence.  Accordingly, the alleged prosecutorial misconduct did not infect the trial with unfairness and did not violate petitioner's due process rights to a fair trial.

E.  <u>Ineffective Assistance of Counsel</u>

Grounds Eleven through Sixteen and Ground Twenty raise ineffective assistance of trial counsel.  Under AEDPA, this Court's review of ineffective assistance claims is "doubly deferential." *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011).  First, AEDPA requires federal courts "to accord deference to the state court's ruling on claims of ineffective assistance of counsel." *Santone v. Fischer*, 689 F.3d 138, 154 (2d Cir. 2012); *see also Hamilton*, 707 F. App'x at 15–16.  As explained above, a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  "The state court decision must be 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for

43

fairminded disagreement.'" *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (quoting *White v. Woodall*, 572 U.S. 415, 420 (2014)).

Second, reviewing courts must show deference to the defense counsel's choices at trial pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984).  *See Harrington*, 562 U.S. at 118; *Rivas v. Fischer*, 780 F.3d 529, 547 (2d Cir. 2015).  In *Strickland*, the Supreme Court set out a two-pronged test for ineffective assistance of counsel claims.  Under the first prong, a petitioner must show that counsel's performance "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.  In assessing reasonableness, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Id.* at 689 (quoting *Michel v. State of La.*, 350 U.S. 91, 101 (1955)).  Under the second prong, a petitioner must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  The Supreme Court defines "reasonable probability" as "a probability sufficient to undermine confidence in the outcome."  *Id.*  In other words, "[c]ounsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'"  *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 446 U.S. at 687). "[T]he *Strickland* test is conjunctive: '[f]ailure to demonstrate either requirement is fatal to a petitioner's claim' of ineffective assistance of counsel."  *Minier v. United States*, No. 16-CR-23 (PAC), 2021 WL 1292820, at *4 (S.D.N.Y. Apr. 7, 2021) (citation omitted); *see Strickland*, 466 U.S. at 697.

In ruling on petitioner's § 440 motion, Justice Kron not only ruled that petitioner's ineffective assistance claim was "without merit," (SR. 245), but specifically addressed most of

the grounds raised in the petition.  With respect to Ground Eleven, Justice Kron noted that

Hearns' prior inconsistent statements "were in fact elicited for the jury's consideration during the

effective and thorough cross examination of this witness by defense counsel."  (SR. 240).  The

Court not only defers to that assessment, *see Santone*, 689 F.3d at 154; *Hamilton*, 707 F. App'x

at 15–16, but fully concurs with Justice Kron.  Trial counsel's cross examination thoroughly

exposed Hearns' prior inconsistent statements and was more than adequate.  (T. 140–42, 144–

45.)

Justice Kron also implied that Ground Fifteen – which faults trial counsel for failing to

object to the Court's interference with the cross-examination of Hearns – is baseless.  Justice

Kron noted that he "foreclosed certain attempts at impeachment" in response to "objections

raised by the People during the complainant's cross-examination."  (SR. 240.)  Thus, there was

no need or basis for defense counsel to object; the issue had been raised through the People's

objection.  Once the Court sustained the objection, defense counsel could have done little more

than take an exception – a formality which was entirely unnecessary.  *See* N.Y. C.P.L.R. § 4017.

With respect to Ground Twelve, which faults defense counsel for failing to move to

suppress the large knife and the photographs of the duplex, Justice Kron found the "argument

that counsel should have sought suppression of these items" to be "meritless."  (SR. 243–44.)  In

order to challenge Ward's search and seizure of the items, petitioner would have to "demonstrate

a personal legitimate expectation of privacy in the searched premises."  *People v. Wesley*, 73

N.Y.2d 351, 357 (N.Y. 1989).  Justice Kron implied that petitioner did not have a legitimate

expectation of privacy because there was an outstanding order of protection prohibiting

petitioner from going to Hearns' residence.  (SR. 243.)

Even if the Court were not to accord deference to Justice Kron's ruling, the Court would presume that defense counsel's decision not to move to suppress was strategic.  On summation, defense counsel noted that Hearns never mentioned two knives in her statement to the police or before the grand jury and reported suffering only a couple of stab wounds.  (T. 227.)  He implied that her trial testimony about the butcher knife was a recent fabrication designed to exaggerate petitioner's criminal intent.  (T. 227–28.)  This argument was central to the defense strategy of convincing the jury to acquit petitioner of the top count for failure to prove intent to cause serious physical injury to Hearns.  Furthermore, even if the jury credited Hearns' claim that petitioner possessed the butcher knife, evidence of such a large knife would suggest that petitioner could have easily inflicted serious physical injury on Hearns had he intended to do so.

Ground Thirteen, which faulted defense counsel for failing to move to suppress the recording of petitioner's jailhouse telephone call, was entirely meritless.  As Justice Kron ruled, this argument was "specious" because inmates were notified, both by signs posted in the jail and by recordings played prior to the calls, that their non-privileged calls were recorded.  (SR. 244–45.)  Citing to cases holding that an inmate's consent to the taping of his telephone calls can be inferred from his knowledge that such conversations would be monitored, *see People v. Jackson*, 117 A.D.3d 966, 968 (N.Y. App. Div. 2014); *Curley v Board of Trustees*, 624 N.Y.S.2d 265, 265 (N.Y. App. Div. 1995), Justice Kron held that "[d]efense counsel's failure to request suppression of all recordings was proper."  (SR. 245.)

Although the Appellate Division subsequently recalled and vacated *Jackson*, it issued a new opinion which reaffirmed the implied consent analysis on which Justice Kron relied.  *See People v. Jackson*, 2 N.Y.S.3d 625, 626 (N.Y. App. Div. 2015).  Moreover, the fact that petitioner was on notice that his calls would be taped is beyond question.  Prisoner telephone

46

calls may be listened to or monitored only when legally sufficient notice has been given to the prisoners. 40 RCNY § 1-10(a), (h). DOCS has therefore issued an Operations Order which "provides for three different notices to advise inmates that telephone calls are recorded and/or monitored." *Johnson*, 27 N.Y.3d at 203. In light of this Operations Order, the Court defers to Justice Kron's ruling that petitioner's proposed suppression argument was specious.

The Court must also defer to Justice Kron with respect to Ground Fourteen, which faults defense counsel for withholding from petitioner the recording of petitioner's telephone call with his brother. Justice Kron noted that defense counsel requested that petitioner be permitted to hear the tape prior to its admission into evidence, but that the judge denied that request. (SR. 244 (citing T. 116–18).) Moreover, even if defense counsel's performance were deficient in this regard, there is not a reasonable probability that defense counsel's actions affected the outcome of the trial. The recording was introduced and played in open court during Hearns' testimony, the day before petitioner testified. Accordingly, petitioner had sufficient time to formulate a response to this evidence. As Justice Kron correctly noted, petitioner "was not harmed in any fashion because he was afforded the opportunity to hear the recording in its entirety prior to the presentation of his defense." (SR. 244.)

Justice Kron did not address Ground Sixteen, in which petitioner argues that trial counsel provided ineffective assistance in failing to object to the charge on attempted assault in the first degree. However, as explained in section II(B), above, the charge was not objectionable. Justice Kron's charge – which appears to track the model instructions in New York's Criminal Jury Instructions, 2d ed. – correctly instructed the jury on the essential elements of the attempted assault charge. Moreover, petitioner has not adduced any evidence to suggest that he would not have been convicted of this charge if Justice Kron had instructed the jury that the only dangerous

47

instrument they could consider was a knife. Even if it were theoretically possible for the jury to find that petitioner was attempting to inflict serious physical injury with the instrument that burned Hearns, there is no evidence that the jury's finding was based on this theory. Indeed, the evidence introduced made it clear that petitioner intended and attempted to inflict the serious physical injury by stabbing Hearns.

Justice Kron addressed Ground Twenty, in which petitioner claimed that defense counsel had failed to object to adjudicating petitioner a predicate felon. Justice Kron noted that defense counsel had in fact challenged petitioner's predicate conviction on the very basis set forth in Ground Twenty but without success. (SR. 246.) Thus, petitioner's claim that defense counsel failed to object is without any basis in fact.

Even if defense counsel had failed to object, that failure would not have affected petitioner's sentencing. As Justice Kron observed, petitioner's argument is based on misapprehension as to when he was convicted. (SR. 246.) Specifically, petitioner incorrectly assumes that he was convicted when he pleaded guilty in 1999, not when he was sentenced in 2003. (SR. 246.) For the reasons set forth in the next section, petitioner was properly adjudicated a predicate felon so petitioner's failure to object would have been of no moment.

F.  Sentencing

In the eighteenth ground for relief, the Petition asserts that petitioner's sentence was unconstitutional, illegal, and harsh and excessive. Since "federal habeas corpus relief does not lie for errors of state law," *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990), petitioner's claim is "cognizable on federal habeas review only if it raises an issue of federal or constitutional law." *Harris v. Perez*, No. 14-CV-7218 (SLT), 2017 WL 5468782, at *6 (E.D.N.Y. Nov. 13, 2017).

48

"No federal constitutional issue is presented where … the sentence is within the range prescribed by state law." *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) (*per curiam*).

In his order denying petitioner's § 440 motion, Justice Kron held that the sentence he imposed on the top count was statutorily authorized.  (SR. 246.)  In addition, the judge held that petitioner was properly adjudicated a predicate felon.  (SR. 246.)  The Court defers to Justice Kron's rulings, which are entirely correct.

First, petitioner was properly adjudicated a second felony offender, as defined in New York Penal Law § 70.06.  Under § 70.06(1)(a), a second felony offender "is a person, other than a second violent felony offender as defined in section 70.04, who stands convicted of a felony … other than a class A-I felony, after having previously been subjected to one or more predicate felony convictions as defined in [§ 70.06(1)(b)]."  Under § 70.06(1)(b), a conviction qualifies as a predicate felony conviction if it is a New York felony conviction, the sentence for which was imposed before – but not more than ten years before – the commission of the present felony.  In calculating the ten-year period, "any period of time during which the person was incarcerated for any reason between the time of commission of the previous felony and the time of commission of the present felony shall be excluded and such ten year period shall be extended by a period or periods equal to the time served under such incarceration[.]"  N.Y. Penal Law § 70.06(1)(b)(v).

There is no question that petitioner's robbery conviction qualified as a predicate felony conviction.  That conviction occurred in New York, where robbery is a felony regardless of the degree of the offense.  *See* N.Y. Penal Law § 160.05 (classifying robbery in the third degree as a class D felony).  Even assuming that petitioner was sentenced on August 23, 1999 – the date on which he pleaded guilty to robbery in the second degree and was sent to a drug treatment

program – rather than on June 4, 2003, as the prosecution alleged, this sentencing occurred less than ten years prior to the July 26, 2009, incident at issue in this case.

The sentences imposed by Justice Kron for the three felonies of which petitioner was convicted were within the range authorized for a second felony offense.  Under the version of New York Penal Law § 70.06(6) that was in effect from April 13, 2007, to March 30, 2011, the sentence for attempted assault in the first degree – a class C violent felony, *see* N.Y. Penal Law § 70.02(1)(b) – had to be a determinate term of between 5 and 15 years.  Petitioner received 12 years.  The sentence for assault in the second degree – a class D violent felony, *see* N.Y. Penal Law § 70.02(1)(c) – had to be a determinate term of between 3 and 7 years.  Petitioner received 7 years for each of his two convictions for this offense.  In addition, under the version of New York Penal Law § 70.45 that was in effect from June 30, 2008, to March 30, 2011, Justice Kron was required to add a 5-year period of post-release supervision to each of the determinate terms, which he did.

The sentences imposed by Justice Kron for the other four offenses of which petitioner was convicted were also within the range authorized by law.  Assault in the third degree and criminal possession of a weapon in the fourth degree are class A misdemeanors.  *See* N.Y. Penal Law §§ 120.00, 265.01.  Under the version of New York Penal Law § 70.15(1) that was in effect prior to April 11, 2019, a court was authorized to impose a sentence not in excess of one year for class A misdemeanors.  Justice Kron imposed a sentence of one year for each of the four offenses.

Since the sentences imposed by Justice Kron were within the range prescribed by state law, petitioner's eighteenth ground fails to raise an issue of federal or constitutional law.

Accordingly, petitioner's sentence claims are not cognizable on federal habeas review.  *See White*, 969 F.2d at 1383; *Harris*, 2017 WL 5468782, at *6.

G.  Ineffective Assistance of Appellate Counsel

The two-pronged *Strickland* test, discussed in section II(E) above, also applies to claims of ineffective assistance of appellate counsel.  *See Pignataro v. Poole*, 381 F. App'x 46, 48 (2d Cir. 2010) (summary order) (citing *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994)).  With respect to the first prong, the Supreme Court has held that "appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."  *Smith v. Robbins*, 528 U.S. 259, 288 (2000).  Thus, "a petitioner must demonstrate *more* than the omission by appellate counsel of a non-frivolous argument" in order "to prevail on a claim that appellate counsel's performance was deficient based on a failure to raise an issue on direct appeal[.]"  *Tatum v. Lempke*, 481 F. App'x 659, 663 (2d Cir. 2012) (summary order) (emphasis in original) (citing *Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000).  "[A] petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker."  *Id.*  With respect to the second prong, a "petitioner must show that 'there was a reasonable probability that [his] claim would have been successful before the [state's highest court]'" in order to "demonstrate prejudice in the context of appellate counsel's ineffective assistance[.]"  *Pignataro*, 381 F. App'x at 48.

Petitioner has not established either prong.  Preliminarily, the Court notes that petitioner was represented by the same attorney – Lynn W.L. Fahey of Appellate Advocates – throughout the appeal.  One of the attorneys associated with Ms. Fahey wrote a 40-page brief on petitioner's behalf, raising four issues.  Although that attorney left Appellate Advocates several weeks before

oral argument, the case was reassigned to another attorney in time for that lawyer to review the briefs and other documents in the file.  (SR. 406.)  That attorney, Kendra L. Hutchinson, submitted an affirmation in response to petitioner's application for a writ of coram nobis, stating that she was "fully familiar with the facts and law involved" in petitioner's case prior to oral argument.  (SR. 406.)  Petitioner has presented nothing to suggest otherwise.

The four issues raised by appellate counsel were not only non-frivolous but, in the case of the fourth point, meritorious.  In contrast, many of the arguments that petitioner faults appellate counsel for not raising are either frivolous or substantially weaker than the ones raised in the brief.  Ms. Hutchinson's affirmation explains in detail why these arguments were not raised on direct appeal and the Court fully concurs with her analysis.  Indeed, the Court notes that neither petitioner's response to Ms. Hutchinson's affirmation nor the papers petitioner has filed in response to this case has pointed out significant or obvious issues that appellate counsel overlooked.

Moreover, petitioner has made no attempt to establish that any of the appellate arguments that Appellate Advocates failed to raise would have been successful.  To the contrary, the Court notes that many of these arguments were raised in petitioner's § 440 motion and were rejected by Justice Kron on the merits.  The Appellate Division declined to grant leave to appeal Justice Kron's decision and this Court has upheld many of Justice Kron's rulings.  Accordingly, there is no reason to believe that any of petitioner's proposed arguments would have been successful if raised on direct appeal.  Ground Twenty is therefore denied.

## CONCLUSION

For the reasons set forth above, the instant petition for a writ of habeas corpus is denied and this action is dismissed.  A certificate of appealability shall not issue because petitioner has

not made a substantial showing of the denial of a constitutional right.  *See* 28 U.S.C. § 2253(c)(2).  The Clerk of Court is directed to enter judgment in accordance with this Memorandum and Order, to mail a copy of the judgment and this Memorandum and Order to petitioner, to note the mailing on the docket sheet, and to close this case.

SO ORDERED.

Dated:  Brooklyn, New York
      September 30, 2022

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge